TEMPE DOWNS *v.* JAMES C. ALLEN *et al.*

1. MARRIAGE. *By free man of color to female slave. Dower.* A formal marriage between a free man of color and a female slave, having an inchoate right to freedom, with the consent of her nominal owner, followed by a living together for years as man and wife, was a valid marriage during the time of slavery, which entitled the woman to dower in the lands of which her husband died seized and possessed.

2. DOWER. *Statute of limitations.* Until assignment of dower a widow has neither seizin of the dower land nor right of entry but only a right of action, and therefore there can be no merger thereof in a fee simple estate afterwards acquired in the land, nor will the statute of limitations run against the right in favor of the heir, or one who comes in, claims and conveys as heir, or those claiming under them.

Downs *v.* Allen.

3. STATUTE OF LIMITATIONS. "*Imprisoned*" *within meaning of statute.* A person of color held by conveyance from the owner under an express trust to set her free so soon as it can be done, and until then to enjoy her own time and be subject to her own control without the interference of any one, and who is permitted by the nominal owner to act as a free person, is not "imprisoned" within the meaning of the statute of limitations, and must sue in the time prescribed by the statute.

4. RECEIVER. *Liable for rents. When.* A receiver to take charge of the property in dispute in a cause, and collect the rents that may accrue from real estate mentioned in the bill, will be liable to the party aggrieved for a failure to take possession of and rent land described in the bill.

5. SAME. *Duty of party at whose instance receiver is appointed.* It is the duty of the party at whose instance a receiver is appointed to see that he performs his duties, and accounts according to law, and, as between such party and the other litigants whose property is impounded, any loss which might have been prevented by the proper diligence of such party must be borne by him.

FROM DAVIDSON.

Appeal from the Chancery Court at Nashville.. E. H. EWING, Sp. Ch.

JORDAN STOKES and JOHN LAWRENCE for complainant.

N. BAXTER, SR., EAST & FOGG, SMITH & ALLISON and J. P. HELM for defendants.

COOPER, J., delivered the opinion of the court.

The bill in this case was filed June 30, 1868, by the complainant, Tempe Downs, as a free woman of color, to recover, in whole or in part, from the defendants the estate, real and personal, of one W. B. Downs, a free man of color, who died in March, 1846,.

at Nashville, where he had long resided. The chancellor, upon final hearing, held that the complainant's right of action was barred by the statute of limitations, except her claim to dower, as widow of W. B. Downs, in the realty of which he died seized and possessed. He ordered an account of rents with a view to ascertain her one-third thereof, and appointed commissioners to allot dower. The accounts ordered were taken, exceptions thereto filed and heard, and a final decree rendered. The commissioners reported that the lands were so situated as not to admit of a specific allotment of dower and a sale was ordered. The complainant and the principal defendants appealed.

W. B. Downs was the slave of W. P. Downs, being the son of a black woman by a white man, and was regularly emancipated by order of the county court on September 13, 1830, having bought his freedom from his master. While a slave he had cohabited with a black woman named Dinah, whom he afterwards bought, taking from her owner a bill of sale to himself on June 28, 1831. He was employed as a servant in a hotel at Brownsville, Tennessee, and being thrifty purchased a lot in the town, built a cabin on it, and placed Dinah in possession. She was employed to do washing for the hotel. There can be no doubt that Downs and Dinah continued to cohabit together, but, so far as appears, without any formal marriage ceremony, and without any actual residence by Downs with her, his duties at the hotel requiring his presence there day and night. In the year 1840, Downs seems to have reconveyed Dinah by bill of sale to the

original owner, which was, however, intended only as
a protection to her under the then existing State laws
touching free persons of color. She continued to act
as a free person of color, living on the lot until her
death, which occurred some years after the date of
Downs' death.

In 1833, Downs moved to Nashville, and became
steward in the Nashville Inn, the principal hotel of
the city. The complainant, Tempe, was a chamber-
maid at the same hotel. She was the slave of one
Thomas Crutcher. With the consent of a former owner,
she had cohabited with another slave as man and wife,
but the relation had been put an end to by the mas-
ter because of the cruelty of the husband to her.
The husband afterwards took up with or married an-
other woman by whom he had children. Shortly after
Downs came to Nashville, he and Tempe began to
cohabit together. About the year 1835, Thomas Crutcher,
the owner of Tempe, seems to have permitted her to
act as a free person upon the understanding that she
should pay for herself a certain sum of money. Having
afterwards paid for herself, on December 2, 1840, as
stated in the bill and conceded in argument, Thomas
Crutcher, by bill of sale reciting the consideration, con-
veyed Tempe to John H. Eaton and James B. Fer-
guson, "on the express trust and condition that they,
or either of them, shall hold and possess her upon
the terms of setting her free so soon as the same can
be done, and until this be effected she is to have and
enjoy her own time and be subject to her own control
without the interference or disturbance of any one."

This instrument as copied in the record has no date, but it is acknowledged by Crutcher for registration on the 24th of January, 1842, and was noted for registration on the same day, and actually registered two. days thereafter.

In the meantime, with the consent of Thomas Crutcher, in the year 1837, Downs and Tempe were formally married by a minister of the gospel, a free man of color, a large company being invited for the occasion, and for an "infair" held in honor of the event. From that time Downs and Tempe lived together as man and wife, and were so considered and treated by the community, white and black. About the year 1840, Tempe seems to have become the chambermaid on one of the large steamers then plying between Nashville and New Orleans, and so continued until the death of Downs and for years thereafter. Downs was thrifty, and about 1842 or 1843, began to purchase lots in Nashville, and improve them. He used for these purposes, no doubt, the earnings of himself and Tempe, and money borrowed from others, and among others from his former owner, W. P. Downs, who had also removed to Nashville. W. B. Downs died in March, 1846, and at the April term thereafter of the county court, W. P. Downs and W. E. Cartwright were appointed and qualified as his personal representatives. The debts of the estate exceeded the personal assets. On March 1, 1847, John H. Eaton and James B. Ferguson, styling themselves trustees of Tempe, filed a bill in the chancery court against W. P. Downs and W. E. Cartwright, as administrators of

W. B. Downs, deceased, the State of Tennessee and
Caroline Sumner, to recover about $500 in money al-
leged to belong to Tempe, which had been received
by W. B. Downs and deposited in bank as a special
deposit, and taken possession of by his personal rep-
resentatives as part of his estate, and to recover also
the value of some household furniture.

This bill stated that the complainants had acquired
by a conveyance from Thomas Crutcher the right to
Tempe in trust to emancipate her whenever the tribu-
nals of the State would permit it, and to receive, in
the meantime, the proceeds of her labor for her benefit;
and that Tempe was still their slave because the tri-
bunals of the State would never permit her to be
emancipated. The bill further stated that the deceased
had Tempe for his wife, "but was not lawfully mar-
ried to her and could not be, as she was the slave
of the complainants." It further stated that W. B.
Downs left a brother who was a slave, whose master
was willing to emancipate him if he were declared to
be the heir; that otherwise the property would escheat
to the State; that the administrators had taken pos-
session of the realty as well as the personalty of the
decedant and was using it for their own purposes;
that the personal property was insufficient to pay the
debts, and complainants had suggested the insolvency
of the estate, etc. The State filed an answer by the
district attorney-general, claiming the property of the
estate as escheated. The other defendants permitted
the bill to be taken for confessed. The court, upon
a hearing, appointed W. P. Downs receiver of the real

estate, and ordered proper accounts to be taken. The
receiver made one or two reports, and some creditors
filed claims, but no decree settling rights was ever
rendered. On May 5, 1854, an order was made, re-
citing that it appeared that the Legislature had relin-
quished all claim to the estate of W. B. Downs,
deceased, and that the defendant (meaning W. P. Downs),
had possession of a portion of the estate, and was
willing to pay costs and the fee of the State's coun-
sel, upon being discharged as receiver. The case seems
thereupon to have terminated, it otherwise appearing
that Tempe probably received the fund she claimed
and that the other creditors were paid off by the ad-
ministrators.

In the meantime the Legislature passed, at differ-
ent times, two acts which bear upon the rights of the
parties in this case. On January 10, 1850, was passed
the act of 1850, ch. 54. By the first section, it was
enacted that when any person shall hereafter die in-
testate, leaving no heirs at law capable of inheriting
real estate under the laws of Tennessee, but leaving a
widow, the widow should be entitled in fee simple to
all the real estate of which her husband died seized
and possessed. The second section is: "That all the
provisions of this act shall be extended to and em-
brace all cases in which persons may have heretofore
died intestate, as mentioned in the first section of this
act, as well as those who may hereafter die intestate,
and for the recovery of such real estate suits have not
been brought, or, if brought, have not yet been de-
termined." On March 3, 1854, the Legislature passed

the act of 1854, ch. 155, by which "all claims on the part of the State" were relinquished "to any and all property left by William B. Downs." This latter act was procured by W. P. Downs.

The doubt as to the ultimate disposition of the surplus of the estate of W. B. Downs, after the payment of debts, grew out of the *status* of Downs and Tempe, at the time of Downs' death, under the laws of this State. This surplus consisted of realty. Downs, it is sufficiently shown, was the son of a negro woman slave by a white man. He was himself a slave until emancipated. His mother had another son by a black man, and this son was a slave at the death of Downs. Under the act of 1819, ch. 13, the act then in force regulating the descent of the property of an illegitimate person, Downs' property would have gone to his half brother. But that brother being then a slave with no right to freedom, present or prospective, was incapable by law of taking property by descent: *Turner* v. *Fisher*, 4 Sneed, 209. If Tempe was the widow of W. B. Downs, and was capable of taking property, she was only entitled to dower in the realty by the law existing at the date of her husband's death. In the absence of heirs capable of inheriting or taking the property, it escheated to the State for the use of common schools. It was for this reason the State was made a party to the bill of Eaton and Ferguson.

Such being the state of affairs, W. P. Downs, who as we have seen, was the former owner of W. B. Downs, and who had loaned him money to assist him in purchasing and improving the property, seems to

have thought that he was entitled to claim the lands. There can be little doubt that what was done was through his influence. The defendant, Caroline Sumner, of Nashville, her sister, Delilah Sumner, of Talladega county, Alabama, and John, Mary and Penelope Smith, children of another sister, of Rutherford county, Tennessee, were induced to claim said lands as the heirs at law of said W. B. Downs, without, so far as appears, having been related to him in any way whatever. On August 3, 1846, the scheme was carried out by these parties making separate conveyances to each other of portions of the realty, and all of them joining in another conveyance of the residue of the realty to W. P. Downs, reciting a consideration of $3,000. In all of these conveyances they describe themselves as free persons of color, and heirs at law of W. B. Downs, and, in the deeds between themselves, they add "by way of compromise" as such heirs. These deeds were all duly registered. And the parties to whom the lands were conveyed, and the defendants claiming under them, have been in continuous adverse possession of the parcels so to them severally conveyed from that time until the filing of the bill in this cause.

The bill, upon the assumption that there was a valid marriage between the complainant and W. B. Downs, sets up claim to dower in the realty by the law as it existed at the date of Downs' death, and to the whole of the realty under the second section of the act of 1850, ch. 54, above quoted. It further seeks, in the event the court should hold that the

marriage was not valid, to recover one-half of the and, or such other proportional part as she may show herself entitled to, by reason of the use of her money by Downs in purchasing and improving the property. And there is proof tending to show the use of her earnings, as well as his own, in the purchase and improvement. The first question in reference to all these claims which naturally arises is whether they are not barred by the statute of limitations. The defendants in possession of the land at the filing of the bill, and those under whom they claimed, had been in the continuous adverse possession of the several parcels of realty in controversy for more than seven years under assurances of title purporting to convey a fee. And however wrongful the possession may have been a first, the time had been sufficient, even before the commencement of the late civil war, to bar the right of action for the land, unless it be as to the claim for dower, under the act of 1819, ch. 28, the statute then regulating the limitation of actions as to realty.

That statute vested with a good and indefeasible title in fee any person having had by himself or those through whom he claimed seven years adverse possession of land granted by the State, holding by an assurance of title purporting to convey an estate in fee, without any claim by action at law or in equity commenced within that time and effectually prosecuted. The statute further provided, e converso, that no person, or any one claiming under him, should have any action, either at law or in equity, for land but within seven years after the right of action accrued. There

was a saving in the statute in favor of any person who, at the time the cause of action occurred, was within the age of twenty-one years, of unsound mind, a married woman, imprisoned, or beyond the limits of the United States, that such person might bring the suit within three years from the removal of the disability. The complainant was not, at the date of the death of W. B. Downs, resting under any of these disabilities, unless she could be said to have been "imprisoned" within the meaning of the statute. Our courts had very properly held that a person of color who was wrongfully held in slavery was imprisoned within the statute: *Matilda* v. *Crenshaw*, 4 Yer., 299. If, therefore, the complainant was wrongfully held as a slave at that time, when she was in fact entitled to her freedom, she might fall within the exception of the statute.

In point of fact, however, the proof conclusively shows that the complainant was only nominally held, under an instrument executed by her last master, and duly registered, by Eaton and Ferguson upon the express terms of setting her free as soon as it could be done, and until then that she should enjoy her own time, and be subject to her own control without the interference or disturbance from any one. And the record demonstrates that the trust was fully executed in this behalf. She hired her own time, received her own wages, went where she pleased, and was to all intents and purposes, so far as Eaton and Ferguson were concerned, a free person. There is not the least evidence that they undertook to control her in any

way, nor is it pretended by her learned counsel that the slightest constraint was put upon her by them or any other person by reason of the nominal ownership. And if there had been, equity would have interfered at once to protect her inchoate right to freedom: *Elias* v. *Smith,* 6 Hum., 33; *Porter* v. *Blakemore,* 2 Cold., 556; *McCloud* v. *Chiles,* 1 Cold., 248. The interest of Eaton and Ferguson, to use the words of this court in an adjudged case, "if such it can be called, was a mere naked trust, subject to be defeated at the pleasure of the complainant, and ceased to exist whenever she deemed it proper to assert her right to emancipation. They were not 'owners' in the literal sense of the statute": *Lewis* v. *Simonton,* 8 Hum., 185.

The learned counsel of the complainant admits that the case made for his client cannot be said to be strictly analogous to the case of a person held as a slave, and therefore imprisoned within the saving of the statute. But he insists that it is within the principle of the statute, because she could not sue for the recovery of her property rights until her inchoate right to freedom was made absolute by the consent of the State. He further insists that upon her subsequent emancipation by the amended constitution of 1865, her freedom extended back by relation to the time when the right first accrued, and vested her with a right of action from that date.

The decisions of this court have been uniform that upon the perfect emancipation of a slave by the consent of the State given in the mode prescribed by law, his freedom would be held to extend by relation

to the time when the right first accrued, so as to enable him to assert in his own name a claim to property acquired in the meantime: *Lewis* v. *Simonton,* 8 Hum., 185; *Bedford* v. *Williams,* 5 Cold., 207; *Jameson* v. *McCoy,* 5 Heis., 108; *Embry* v. *Morrison,* 4 Baxt., 186; S. C., 1 Tenn. Ch., 434. In all the cases in which this doctrine has been held there was no question as to intervening rights of third persons by the statute of limitations or otherwise. The problem is greatly complicated by the intervention of other rights: *Andrews* v. *Page,* 3 Heis., 668; *Stothart* v. *Harrison,* 1 Tenn. Ch., 635, 640.

The argument in behalf of the complainant is based upon the assumption that the law afforded no mode of redress for the assertion of property rights by a person in the situation of the complainant at the date of the death of W. B. Downs. In this view, there would have been one class of the community, perfectly free to act, and yet without the pale of the law. It must be admitted that the situation of the class was curiously anomalous, but yet the courts found no difficulty in affording them redress whenever applied to upon well settled principles. The law, as between the State and the individual, recognized only two classes, the freeman and the slave. As between individuals, it took notice of the intermediate class, and enforced the right to freedom, and protected the rights of property. In the former view, whatever the slave earned, or received whether as agent of the master or not, belonged to the master: *University* v. *Cambreling,* 6 Yer., 79; *Fletcher* v. *The State,* 6 Hum., 256. And the

master, although he had conferred upon the slave an inchoate right to freeedom, was responsible to the State for the offenses of the slave, such as the selling liquor contrary to law, or other like violations of the penal Code: *James* v. *The State*, 9 Hum., 308. And the money or other property of a slave in that condition might be recovered from a debtor by a third person, through whom the transaction was made, for the use of the owner of the slave, and *a fortiori* by the owner himself: *Jenkins* v. *Brown*, 6 Hum., 299. On the other hand, devises or grants of property to slaves coupled with the gift of freedom, or where the devisee or grantee had already acquired an inchoate right to freedom, might always be secured and enforced by bill in chancery directly by the person entitled: *Boon* v. *Lancaster*, 1 Sneed, 578; *Laura Jane* v. *Hagan*, 10 Hum., 332; *Lewis* v. *Daniel*, 10 Hum., 314; *Nelson* v. *Smithpeter*, 2 Cold., 13; *DeBerry* v. *Hart*, 7 Baxt., 390; *Banks* v. *Banks*, 2 Cold., 546. A next friend was required by statute to obtain the consent of the State to become a citizen, but not for the enforcement of a right to property, if the emancipation had been perfect, as by removal to a free State: *Fisher* v. *Dabbs*, 6 Yer., 120, 160; *Laura Jane* v. *Hagen*, 10 Hum., 332. The courts were, therefore, always open to the nominal master, or to the person entitled to the inchoate right to freedom: *Young* v. *Cavitt*, 7 Heis., 18. The complainant was not "imprisoned" within the saving of the statute of limitations, so as to prevent her from asserting her right to the property in controversy at any time she saw

proper.   And her nominal owners might have recovered in their own names any property earned or acquired by her.   She was clearly not within the saving of the statute.

The real difficulty in her case, as is apparent on the face of the bill filed by Eaton and Ferguson on her behalf, was not in finding a remedy, but a right.   They were manifestly of opinion that no valid marriage could be contracted at that time, under our statutes, between a free man of color, and a woman of color having only an inchoate right to freedom.   Our system of marriage by license was manifestly intended for free persons, and the marriage of a slave was necessarily subject to the control of the master.   It is very doubtful whether the marriage of a free person with a servant, by consent of the master or mistress, upon the publication of the banns of matrimony, of the old act of North Carolina of 1741, was intended to apply to slaves at all.   And the fact that such marriages between a free man of color and a slave were sometimes permitted by the master is recognized by the act of 1845, ch. 184, sec. 2, only for the purpose of allowing the free person of color to remain within the State upon the owner of the slave giving bond with security before the county court for the good behavior of the free man of color.   But this court, upon full consideration, in view of the emancipation of the slaves, and the enabling act of the Legislature touching the marital relations of this class of the community, and their rights of inheritance, came to the conclusion that a marriage between slaves, with the assent of their

owners, whether contracted in common law form or celebrated under the statute, was always a valid marriage. "We do not hold," says the court, " that such marriages were followed by all the legal consequences resulting from the marriage of white persons. From the very nature of the institution of slavery, they could be determined at the will of the owners, and the laws of inheritance were not applicable to them, for the reason that slaves could not, in a legal sense, become the owners of property; but still, this marriage relation, however restricted, might and often did become the foundation of legal and equitable rights of the highest importance." " The act of 1866," it was added, " having been passed to ratify marriages good during the institution of slavery by the prevailing usage of this State, and to create a right of inheritance conformable to such usage, and the changed condition of the slave, was in furtherance of good morals, and of the best interests of the State; and where no other rights have intervened, was eminently constitutional and proper ": *Andrews* v. *Page,* 3 Heis., 653. See also *Stothart* v. *Harrison,* 3 Tenn. Ch., 635, and *Trafford* v. *Young,* 3 Tenn. Ch., 496.

If a common law marriage was valid between slaves, there can be no reason for adopting a different rule as to a common law marriage between a free man of color and a female slave, vested with an inchoate right to freedom, the nominal master consenting. The marriage between complainant and W. B. Downs was therefore valid, unless the previous marriage of both of the contracting parties invalidated it. As to the complain-

ant, the proof is clear that her first marriage "was determined by the will of her master," which "from the very nature of the institution of slavery" he might do. The case of Downs is more doubtful. But, in view of the fact that his cohabitation with Dinah is not shown to have been commenced with the assent of their respective owners, or sanctioned at any time by a formal ceremony or plain recognition on his part, or continued by that open cohabitation and living together under one roof which usually indicate an avowed marriage, we think that there is not enough to establish a good common law marriage between them, especially as the testimony of some of the witnesses tends to show that the intercourse was understood by them to be illicit. The subsequent reconveyance of Dinah may also be treated as a determination by the owner of the previous relation. It is doubtful whether Downs ever returned to Brownsville more than once after he removed to Nashville, and then only for a few days.

Treating the marriage as valid, the complainant was entitled, upon the death of the husband, to dower in the realty of which he died seized and possessed. The dower never having been assigned, the right was not merged by the estate acquired under the second section of the act of 1850, if we treat that section as conferring upon her the title of the State by escheat, for the obvious reason that until assignment, a widow has neither seizin nor right of entry, but only a chose in action. It was for this reason, coupled with the fact that the possession of the heir was not adverse to the right, that our court held that the widow's right of

action was not barred by the possession of the heir,. or of any person who comes in under him, for seven years, by virtue of the act of 1819, ch. 28, sec. 2;. *Guthrie* v. *Owen,* 10 Yer., 339.

Nor are the defendants in this case protected under the bar of the statute by reason of the fact that they, or those under whom they claim were not in fact the heirs of Downs: *Carmichael* v. *Carmichael,* 5 Hum., 98. For the title deeds by which they hold show upon their face that they went into possession as the heirs of the deceased, and made the conveyances of the several parcels of land exclusively in that character. And they insist in their pleadings upon, although they have not established the heirship. The parties are estopped to deny the truth of the claim under which they went into possession and have since held. The chancellor's decree on the merits was therefore correct, and will be affirmed.

The chancellor's decrees upon the matters of account are also substantially correct. The only exception of the complainant which deserves consideration, in view of the concurrent rulings of the chancellor and the commissioner who took the account, is the exception to the report upon the receiver's account, that the receiver should have been charged with the rent of a portion of the realty during the period after his appointment in which he neglected to take possession of it. The original order appointed a receiver of the property in litigation. The appointment of the actual receiver was upon the condition of his giving bond with security " for the collection of the rents that

may accrue from the real estate mentioned in the bill."
The bond recites that the receiver is to take charge
of the "property in dispute in this cause." The prop-
erty overlooked is specifically mentioned and described
in the bill, and the receiver by ordinary diligence
would have discovered it. He is clearly liable for the
oversight. But inasmuch as the complainant was only
entitled to. impound the property for her one-third of
the rent, and as the claimant of the property cannot
complain of the omission, the receiver will only be
charged in favor of the complainant with one-third of
the rent for the period of omission, with interest.

It became the duty of the complainant, upon the
appointment of a receiver at her instance, to see that
he performed his functions, and that all necessary orders
were made from time to time to compel him to act
and account according to law. Any loss which may
occur by the negligence of the complainant must, as
between her and the other complainants of the prop-
erty, fall upon her: *Terrell* v. *Ingersoll*, 10 Lea, 77.
To the extent, therefore, of the recovery against the
receiver, the complainant will be required to look in
the first instance for the satisfaction of her recovery
against the defendants. In other words, on the amount
of any money decree rendered in her favor against any
one defendant, she will be required to enter a credit
to the extent of the amount found in the hands of
the receiver due to that defendant, and to look to
the defendant only for the residue. And if the re-
ceiver is chargeable in favor of any defendant with
more than the amount of the recovery of the com-

plainant against the defendant, the defendant will be entitled to be first paid that surplus out of the money collected from the receiver, and the residue will be applied to the satisfaction of the complainant's recovery. The costs will be paid out of the funds in the hands of the receiver.